No. 10,100.

MILLIKEN v. FREDRICKSON.

Decided July 2, 1923.

Action for dissolution of partnership and accounting. Judgment for plaintiff.

*Reversed.*

1.  APPEAL AND ERROR—*Referee's Report—Presumption.* In the absence of an affirmative showing, the appellate court will presume that the trial court, in approving a referee's report, did so after a careful consideration and denial of exceptions filed thereto.

2.  *Abstract of Record—Examination of Record.* On review, the appellate court will assume that the abstract fairly presents the evidence and facts upon which the decree of the court is based, and will not assume the task of examining a voluminous transcript and making independent findings therefrom.

3.  MINES AND MINING—*Contract for Development—Construction.* Contract relating to the sale of an interest in mining property, expenditure of the funds derived therefrom, and development of the property, considered and construed.

4.  *Partnership—Liability of Withdrawing Partner.* At the end of a period contemplated by a partnership contract for the developing of mining property, either party could withdraw from the partnership by refusing to have further connection therewith, and thereafter he could not be charged with any portion

of expenditures made by the other party, to which he did not assent, and which were incurred by the continuing partner alone.

5.   APPEAL AND ERROR—*Referee's Report—Erroneous Decree.*   Where it appears to the court on review, that the findings and report of a referee—approved and adopted by the trial court—were erroneous, the judgment based thereon is set aside.

*Error to the District Court of the City and County of Denver, Hon. Charles C. Butler, Judge.*

Mr. JOHN R. SMITH, for plaintiff in error.

No appearance for defendant in error.

*Department Three.*

MR. JUSTICE CAMPBELL delivered the opinion of the court.

PLAINTIFF in error Milliken, defendant below, had a mine in Nicaragua, Central America. Fredrickson, defendant in error, plaintiff below, had money in Omaha for investment. Milliken needed money to develop his mine; Fredrickson wanted mining property. As each desired to accommodate the other, they entered into a contract March 2, 1915, supplemented by a later one of March 27, which enabled Fredrickson at once to part with some, and later with much more, of his money and afforded Milliken the opportunity to divest himself of an interest in his property. In the first contract there was a recital that Milliken had borrowed of Fredrickson $10,000. The loan was evidenced by a promissory note and secured by a deed of transfer of an undivided one-half interest in the mine. A clause in the contract gave to Fredrickson an option to purchase for $50,000 from Milliken this one-half interest which secured the loan, which was to be exercised within ten days after a thorough inspection of the mine had been made by both parties. In the event that Fredrickson elected to buy, this note was to be cancelled and returned to Milliken and the $10,000, theretofore secured as a loan, was to be considered and taken as one-fifth of the purchase price, all of which purchase price, amounting to

$50,000, was to be used in the purchase of equipment, machinery and supplies for the mine and for general development purposes. If Fredrickson chose not to buy, the $10,000 borrowed and evidenced by the note was to be paid with interest in accordance with its tenor. Fredrickson was also given the option to take a certain additional interest in the mining property in lieu of the payment of the loan, in which event the note was likewise to be cancelled and returned to Milliken. If Fredrickson exercised the option to buy, the parties agreed to enter into a further written contract in which was to be set forth the method of operating the mine, defining their various relations in connection therewith, their responsibilities and authority, and making certain provisions by which each might, upon prescribed conditions, buy the interest of the other. Fredrickson, having indicated his intention to exercise his option to buy, the parties, on March 27, entered into this supplementary contract provided for in the original one of March 2. This later contract recites that Fredrickson had waived inspection and examination of the mining property in advance of the exercise of his option to buy. Therein he agrees to release, cancel and deliver to Milliken the note which evidenced the loan, and the parties agreed that the $10,000 theretofore borrowed, was to be, and should be, applied as a partial payment upon the entire purchase price of $50,000, and the whole thereof was to be laid out and expended in the development of the mining property and in the construction of a mill thereon. Before the supplemental contract was made it seems that Milliken applied a portion of the borrowed money in the purchase of equipment, machinery and supplies and the later agreement provided that the unexpended balance thereof was to be deposited by him in a bank in New Orleans and the same was to be used, as was the rest of the purchase money, which was to be advanced from time to time by Fredrickson as the same was needed, in the making of the mine. The agreement further recited that Fredrickson had waived the option given to him

in the first contract to take a one-tenth interest in the mining property in lieu of the payment of the loan, and that the note evidencing the same was to be cancelled and returned to Milliken. It was further provided that for the time being or temporarily the property was to be operated by the parties jointly as individuals, each owning an undivided one-half interest, and each partner was to have equal authority with the other, and if either sold his interest in the property before the organization by them of a corporation to work the same, which was one of the methods they had in view for conducting the business, the purchaser should not have any power to create any indebtedness against the other party not selling or to pledge the credit of the mine without the express written authority of the partner who retained his interest. There are a number of other provisions in the contract which, upon the branch of the litigation now before the court, are immaterial.

As not infrequently happens in such enterprises, this venture did not prove a success. Each of the parties spent some time in Nicaragua giving to the business in hand their supervision. Milliken, an expert mining man, directed mining operations, and Fredrickson, a business man, devoted his time to the business part. The health of each was seriously impaired on account of climatic and other conditions. The parties were not entirely harmonious. They differed upon some important questions and upon others of a minor character. As the result of such conditions, and the fact that the enterprise was a failure, Fredrickson, brought this action in April, 1917, in the Denver district court to recover of Milliken damages in the sum of $190,000 alleged to have been sustained by him as a result of fraudulent representations by Milliken as to the property. In one of the defenses of his answer, and by way of counterclaim, Milliken requested, in which request the plaintiff by his replication joined, that an accounting be had of the various transactions between them in carrying out their enterprise under these agreements.

The court first submitted to a jury the issues of law involved as to the damages, and the jury returned a verdict for the defendant, and that branch of the controversy is not involved in this review. The court ordered a reference as to the accounting, empowering the referee to take evidence, make findings of fact, and to report all of his proceedings, designating therein the judgment or decree to be rendered. Upon the filing of such report by the referee, detailed and specific exceptions thereto were filed by Milliken. There is nothing in the record to show that this report was considered by the court; at least, there is no order either sustaining or overruling the exceptions, unless the same was impliedly or incidentally overruled by the order which the court entered approving and adopting the report of the referee as the finding of the court, and the consequent entering of judgment thereon. To this judgment upon the referee's report, Milliken has sued out this writ of error. There is no appearance by defendant in error.

It is the contention of plaintiff in error that the district court refused to hear argument or read or examine the evidence, though he had filed specific exceptions to the findings and recommendations of the referee. It is also urged that to the undisputed facts, the referee applied erroneous principles of law, and in making his findings of fact and in his recommendations as to the decree, proceeded upon a theory which neither of the parties entertained or adopted, but which was contrary thereto and to the statement of claim which the plaintiff himself had filed with the referee.

. 1. As to the first assigned error that the approval of the court was without investigation or examination of the evidence, the record is not altogether clear whether or not the court failed in this particular. In *Jones v. Van Horn*, 28 Colo. 126, 63 Pac. 307, and *Peck v. Alexander*, 40 Colo. 392, 91 Pac. 38, this court said that where exceptions are filed to a report and findings of a referee, it is the duty of the trial court to examine the evidence with a

view to determining whether the recommendations and findings are thereby sustained, and if there is a failure in this respect by the court, its judgment of approval, if made, should be set aside. In the Peck case, however, the court said that to overcome the presumption that the trial court did examine the testimony and did duly consider the exceptions filed, and did every other act imposed upon it by the law and practice, an affirmative showing to the contrary must be made by the record. Counsel for plaintiff in error in his brief says that the court simply accepted the referee's report and approved his recommendations and entered judgment over defendant's exceptions "exactly as found and recommended by the referee, frankly stating that he could not and would not take the time to consider the voluminous record and exhibits which had been returned by the referee or the objections and motion we had filed." We do not find in this record, either in the bill of exceptions or in the record proper, the language quoted, or any language similar to it. It is possible that the language used by counsel is the deduction he makes from the absence in this record of any recital or statement that the exceptions and objections filed by the defendant were presented to, or heard by, the court. If such effect be given to such negative showing there would be justification for counsel's statement. It is scarcely necessary to say that we must dispose of this objection upon the record itself. Though not questioning the veracity of counsel, the reviewing court must not accept such a statement unless it finds support in the record. There is a recital in the record before us that the court approved the report of the referee in its entirety and entered judgment upon it. In the absence of the affirmative showing required, we must presume that the court—even though there is an absence of recital that the exceptions were duly considered and overruled—in approving the referee's report, did so after a careful consideration and denial of the exceptions.

2. Realizing, as we do, that the disposition of such

questions as are here presented, without the assistance of counsel for both parties, is attended with difficulty, and that the transcript of the record might lead to a conclusion other than that we have drawn from the abstract, we may, nevertheless, rightly assume that this abstract of the record fairly presents the evidence and the facts on which the decree of the court is based. We are not required to assume or perform the task of counsel for either party and examine this voluminous transcript and to make findings of our own from our deductions of its contents.

In the summary of the transactions of these parties made by the referee, he states two accounts: one, between plaintiff and defendant as individuals; another, a co-partnership account. Among other items he charges plaintiff with the $10,000 note and interest, aggregating $12,264.44 under the individual account, which he finds defendant owes to the plaintiff irrespective of, and not in connection with, the co-partnership account. In the co-partnership account he gives credit to the plaintiff for $29,739.46, one item of which is $18,000 expended by the plaintiff in excess of the $40,000 which plaintiff paid as part of the purchase price of the mine. Another item is $11,737.81 said to be an additional expenditure for joint account, and, therefore, finds that plaintiff's contributions to the expense of operation amounted to $29,739.46. In the same account he gives credit to the defendant for advances made by him toward expenses of $8607.73, making the aggregate expenditure of both parties about $38,346.15, and by deducting from this aggregate expenditure the sum of $761.04, which he finds should be charged to the defendant, he computes the net expenditure at $37,586.15, of which the plaintiff contributed $29,730.46, and of which plaintiff's share was $18,793.07, thus showing an overpayment by the plaintiff of $10,946.48. He finds that the defendant should have contributed $18,793.07, and, in addition thereto, should have assumed and paid the sum of $761.04, which was a bill for services not connected with the mine for which defendant claimed a credit. He credits the

defendant with $6582.97 which he had advanced toward the expenses of operation. The conclusion was that, on the partnership account, the defendant should pay plaintiff $12,971.14, and to this should be added the defendant's indebtedness on the individual account of $12,264.44, aggregating $25,245.58.

If there is any evidence which authorized the referee to state an individual account, it does not appear in the abstract of the record. The plaintiff's own statement of claim filed with the referee is upon a different theory, and there is no justification, so far as we can discover, for charging the defendant in an individual account with the $10,000 note and interest. It is true that Milliken, in his individual capacity, had borrowed $10,000 from Fredrickson and gave his note therefor, which he was obliged to pay unless released therefrom. This note was subsequently cancelled at the time of the making of the supplemental contract and Milliken's liability thereon ceased when it was agreed by the parties that the amount thereof should be applied as part of the purchase price of the mine which Milliken conveyed to Fredrickson. It is also true that the one-fifth part of the purchase price was to be applied by Milliken, as was the other four-fifths, by both parties, in developing the property, but the liability on the note as such ceased and Milliken's liability thereafter, with respect to the $10,000, if any, was, by the express terms of the supplemental contract, for failure to apply the unexpended balance thereof on the mine. This was a partnership obligation he then incurred and any failure on his part so to apply this money was a partnership liability and should be adjusted in connection with, and as part of, the partnership account. It is something more than a technical, it is a substantial, distinction arising out of and based upon, their written agreement. This agreement recites that a portion of the $10,000 which was loaned to Milliken, had been applied before the supplemental agreement was made, in the purchase of supplies and for other expenditures as agreed upon by the par-

ties, and that the balance of the same was to be deposited in a bank in New Orleans and all of it ultimately was to be expended in furnishing supplies, equipment, machinery and for development purposes generally. The evidence discloses that Milliken did not actually deposit this exexpended balance in the bank, but it does show, without contradiction, and this is the essential thing, that from time to time he did expend the total balance of about $6,000 of it for the purpose for which it was to be used, and that it was advanced as a part of the $10,000 which Fredrickson paid on the purchase price of the property. The referee expressly finds that this amount was advanced by the defendant, but does not give him credit for the same as a part performance of his duty to devote the $10,000, part of the purchase price, to mine purposes, but finds that it should be credited to him under the joint account as a part of the share which he, as a member of the mining partnership, was bound to contribute to the expenses of development, in addition to the $10,000. As we have said, the plaintiff's own statement of claim filed with the referee, claimed damages of the defendant for his failure to use or deposit this $10,000 as provided for in the contract: first, the amount of the $10,000 which has not been expended for the purposes of the two contracts, $3862.20; second, interest on this sum; thus clearly showing that the plaintiff himself recognized that the note was cancelled and that defendant's liability with respect to the $10,000 was only because he did not deposit or use the full amount thereof as the contract called for, but had only expended the sum of about $6500 for such purposes. The agreement may be searched in vain for any obligation that is imposed upon Milliken to advance any sum of money of his own, or which he had in his possession, in the development of the mining property, except the unexpended balance of $10,000 in his possession at the time the latter contract was made. He was simply to expend or advance and apply this unexpended balance, nothing more. The only provision in the contract with respect to

expenses of development and operation is that the entire purchase price must be expended on the mine, and the only further obligation imposed upon Milliken is that he should be at the mine and give it his personal attention. There was no requirement in the contract between the parties that Milliken should advance any sum whatever of his own while the parties were temporarily operating the property in the way of development. It must be borne in mind that the $50,000 which Fredrickson agreed to pay Milliken for a one-half interest in the mine, was, by the agreement of the parties, to be expended by them in developing the property. It is hardly reasonable to suppose, and there is no provision of the contract to that effect, that Milliken was, after its exhaustion, to advance of his own money an equal share with Fredrickson in the mine's development, but that the limit of expenditures upon his part was measured by the $50,000 which he got for parting with a one-half interest, all of which he consented might be devoted to development. If there was any further obligation resting upon Milliken with respect to bearing a share of the expenditures for development work, after the $50,000 was consumed, it was a matter of adjustment between the parties and there is no evidence in this record, or in the written agreements, that any provision with respect thereto was made by them. If it be true, as matter of fact, or law, that after the $50,000 was so expended, Milliken consented to, and did, co-operate with Fredrickson in further development of the mine, it may be, but no such case is presented here, that each party would be liable, in the absence of any specific agreement to the contrary, for one-half of these expenditures. Plaintiff's theory of the case was not upon any such basis. The contract expressly provided for a temporary operation of the mining property, which, in view of all the facts, seems to have been that the parties should proceed with the operation as a mining partnership until the $50,000 was exhausted. At the end of that time either party might withdraw from the partnership by refusing to have fur-

ther connection with it, and thereafter could not be charged with any portion of expenditures made by the other party to which the withdrawing partner did not assent, and which were incurred by the continuing partner alone. This doctrine is stated in *Wahl v. Larsen,* 70 Colo. 274, 201 Pac. 48, and *Lamont v. Reynolds,* 26 Colo. App. 347, 144 Pac. 1131, and 18 R. C. L., sections 103 to 108, pp. 1196-1204. The facts to which these principles of law are applicable are that sometime after this action was brought by the plaintiff, which it would seem was intended by Fredrickson to be, and was, in legal effect, a dissolution of the co-partnership, plaintiff went to Nicaragua, or sent representatives there, and took sole charge of the mine and continued the work of development and operation, entirely ignoring Milliken, who had ceased to take any further part therein and was at his home in Denver. No reports to Milliken were made of the development work; no assistance was asked from, or given by, him except in a letter of advice, which Fredrickson's attorney solicited, he made certain suggestions with respect to the work which he was advised Fredrickson was conducting at the mine. Milliken had no voice whatever in its management or control after this suit was brought. The referee, as we gather, made no distinction between expenses incurred after this suit was brought and expenses incurred while Milliken was participating in the development work. The partnership account seems to have been stated upon the theory that each of the co-partners was responsible for one-half of the entire expenses of development, whether or not Milliken participated in, or assented to, the same. In view of the showing as made by the abstract of the record and statement of claim filed by the plaintiff, there should not have been two separate accounts but only one, and that a co-partnership account. This firm account is not sustained by the evidence, and is contrary to the theory of both parties.

In the state of the record, as we find it, and for the reasons already indicated, no judgment on the merits should

be directed by this court. The decree as rendered, for the reasons given, should be set aside and the cause remanded with instructions to the district court to set aside its decree and its order approving the report and findings of the referee, and, at its option, to make the necessary corrections in the findings and report of the referee, or, in the alternative, to re-refer the matter to the referee to proceed to revise and re-state the account, which must be in harmony with the views expressed in this opinion, whether the re-statement and revision be made by the court or by the referee in the first instance.

Reversed and remanded.

MR. CHIEF JUSTICE TELLER and MR. JUSTICE SHEAFOR concur.